UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MOLLY ABRAHAM,

        Plaintiff,

     v.                                  Case No. 15-cv-1116-pp

BOARD OF REGENTS OF
THE UNIVERSITY OF WISCONSIN SYSTEM,
SUE WESLOW, SHANNON BRADBURY,
DEVARAJAN VENUGOPALAN, JOHANNES BRITZ,
and JASON KUIPER,

        Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 33) AND DISMISSING CASE**

---

The University of Wisconsin-Milwaukee (UWM) eliminated the plaintiff's position after fourteen years. The plaintiff attributes the defendant's decision to her sex and to retaliation for filing a complaint, and asserts that the defendants interfered with her exercise of Family Medical Leave Act (FMLA) and her requested accommodations. The plaintiff's second amended complaint includes claims under Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1963, the Americans with Disabilities Act, the Rehabilitation Act, the Equal Pay Act, the Fourteenth Amendment, the Family Medical Leave Act and 42 U.S.C. ¶1983. Dkt. No. 16.

The defendants have moved for summary judgment on the ground that UWM had a legitimate, nondiscriminatory reason for its decision—the plaintiff

had been tasked with maintaining a software program that had become obsolete over the course of years. Dkt. No. 41. After convening a task force, the defendants conducted an independent audit identifying weaknesses and security concerns with the software. According to the defendants, they made the decision to lay off the plaintiff after decommissioning the software and concluding that she was not qualified to replace the other two people in her unit (a male and a female). Id. at 3. They also assert that that the plaintiff's requested accommodations were unreasonable as a matter of fact and law.

The plaintiff since has abandoned her claims under the Equal Pay Act and the Fourteenth Amendment. She still maintains that the defendants discriminated against her over the years, pointing to the sequence of events as her "best evidence" of discrimination. In mid-2012, the plaintiff filed a complaint alleging unequal pay based on sex. Defendant Jason Kuiper denied her request for accommodations in late 2013, and defendants Shannon Bradbury and Sue Weslow made the decision to eliminate the plaintiff's position at the end of June in 2014. Dkt. No. 43. Because the timing fails to raise a genuine issue of material fact, the court will grant the defendants' motion.

## I.      Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317,

324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## II.    Findings of Fact

The parties' proposed findings of fact highlight the problems that occur when litigants fail to follow the local rules. The civil local rules call for no more than 150 separately numbered statements of fact. Civil L.R. 56(b)(1)(C)(ii) (E.D. Wis.). A party opposing a statement of fact must respond to each paragraph with specific references to the affidavits, declarations, parts of the record and other supporting material that supports her position. Civil L.R. 56(b)(2)(B)(i)

(E.D. Wis.). If the party opposing summary judgment intends to rely on additional facts, she should provide a statement consisting of short numbered paragraphs with the additional facts and citations to the record. Civil L.R. 56(b)(2)(B)(ii).

The defendants filed proposed findings with more than one material fact per paragraph. The plaintiff responded to each paragraph with additional proposed findings that should have been filed as a separate statement. In addition, the plaintiff included citations to evidence that did not dispute the proposed finding of material fact or that was not supported by the citation provided. The Seventh Circuit has made clear that a "district court is not required to 'wade through improper denials and legal argument in search of a genuinely disputed fact.'" Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) (quoting Bordelon v. Chi. Sch. Reform Bd. of Trs., 233 F.3d 524, 529 (7th Cir. 2000)). Despite this dispensation, the court waded, and has considered findings to the extent they are supported by the record.

A.    UWM: Organization

UWM, a large public university, employs a workforce of approximately 3,800 employees (excluding student workers). Dkt. No. 36 at ¶3. It has policies in place to make it an equal opportunity, affirmative action employer, and it prohibits discrimination on the basis of race, sex, color, national origin, age or any other statute protected by Wisconsin or federal law. Id. at ¶4. UWM also prohibits discrimination based on additional classes such as gender identity. Id. UWM maintains a separate Discriminatory Conduct Policy that provides a

mechanism for employees to file discrimination complaints with UWM's Office of Equity/Diversity Services (EDS). Id. at ¶5. The plaintiff does not dispute that these policies exist.

UWM is organized into several divisions, including the Division of Academic Affairs and the Division of Finance & Administrative Affairs (FAA). Id. at ¶¶6, 8. At all relevant times, Provost and Vice Chancellor Johannes Britz headed the Division of Academic Affairs. Id. at ¶ 8. Vice Chancellor Robin Van Harpen headed the Division of Finance & Administrative Affairs (FAA). Id. at ¶2.

There are eight units in the FAA, including the Department of Human Resources and University Information and Technology Services (UITS). Id. at ¶6. The Department of Human Resources had several different people in charge during the relevant period. Associate Vice Chancellor of Human Resources Sue Weslow headed the Department of Human Resources from March 21, 2011 through January 31, 2014. Id. at ¶7. An Interim Associate Vice Chancellor headed the department between February 1, 2014 and August 4, 2014. Id. Associate Vice Chancellor Tim Danielson took over the position from August 5, 2014, through the time the defendants filed for summary judgment. Id.

B.     The Plaintiff's Job

UWM hired the plaintiff on January 1, 2000 on a fifty percent contract for one semester as an Associate Administrative Specialist within Academic Affairs. Dkt. No. 35 at ¶3. In that position, she assisted the coordinator of the UWM Faculty Mentoring Program. Id. In November of 2001, UWM promoted the

plaintiff to full-time Administrative Specialist and she continued to work as the Assistant to the Coordinator for the Faculty Mentoring Program. Id. at ¶4.

Two years later the plaintiff's position moved into the newly-created Employee Development Program within Academic Affairs, which ultimately replaced the Mentoring Office. Id. at ¶5. Pauli Taylorboyd served as the Employee Development Program's Director until her retirement on June 30, 2011, and Taylorboyd reported to Devarjan Venugopalan (Associate Vice Chancellor for Academic Affairs, and previously Associate Dean of the College of Engineering and Applied Sciences). Id. at ¶¶5, 2. Although the Employee Development Program was physically located in the Human Resources Department's office space, it was not formally a part of the Human Resources Department. Id. at ¶6. Taylorboyd and the plaintiff were the only two permanent staff members in the Employee Development Program. Id. at ¶7.

Before joining the staff at UWM, the plaintiff had two different jobs where she taught herself to create web pages. Dkt. Nos. 34 at ¶13, 48 at ¶13. She did not, however, have formal training in web design or web development. Dkt. No. 42 at 3, 4, 5. After she was hired by UWM, she took a two-day course in a programming language called "cold fusion." Id. at 5.

1. *MyDev*

As part of the plaintiff's duties, she created and launched the My Development (MyDev) registration tool. Dkt. No. 35 at ¶8. MyDev was a web-based system that, among other things, assisted in organizing and scheduling employee trainings. Id. MyDev was very useful when the plaintiff first created

6

it. Id. at ¶36. It allowed people to post programs they offered for employee development, allowed people to register for programs, and would add the program to the registrant's university calendar. Id. This was something that UWM did not have and there were no comparable programs available. Id. at ¶37. The programming language used to create MyDev was cold fusion. Id.

The plaintiff's primary duties between 2004 through 2014 revolved around managing and maintaining MyDev. Id. at ¶8. The plaintiff asserts that MyDev could do more than organizing and scheduling. For example, the plaintiff says that that all members of the campus community could search for and register for training and professional development opportunities; that the program could send calendar invitations as reminders; that it allowed users to cancel their registrations, produce searchable calendars of training opportunities and interface with Human Resources and Student registration systems; that it provided multimedia training to the campus community; and that it could produce certificates of completion and keep an electronic record of training and activities for all users. Dkt. No. 44 at ¶4.

2. *Reclassification*

In 2004, the plaintiff petitioned to have her position converted from Academic Staff to Classified Staff as an IS Comprehensive Services Senior. Dkt. Nos. 35 at ¶9; 35-1. UWM granted her request and she became part of the state civil service system on July 1, 2004, subject to chapter 230 regarding recruitment, compensation and layoff. Dkt. Nos. 35 at ¶39; 35-2. UWM

reclassified the plaintiff again, this time, as an IS Comprehensive Service Specialist, on October 11, 2009. Dkt. Nos. 35 at ¶10; 35-3.

UWM restructured several times over the years. On June 19, 2011, the Payroll Office consolidated with Human Resources and moved from the Division of Academic Affairs into the FAA Division. Dkt. No. 36 at ¶9. When Taylorboyd retired, the plaintiff reported directly to Venugopalan. Dkt. No. 35 at ¶11. At that point, the plaintiff became the only permanent employee working in the Employee Development Program Unit. Id. at ¶12. The plaintiff acknowledges that Venugopalan assumed some of Taylorboyd's duties, for which he did not receive any additional monetary compensation or bonus, id. at ¶13, but she asserts that his contributions were minimal, dkt. no. 44 at ¶7.

Sometime after Venugopalan started supervising the plaintiff, he scheduled weekly meetings with the plaintiff. Dkt. No. 35 at ¶14. Because he had many different responsibilities, had a busy schedule and often travelled, Venugopalan missed some of the meetings and asked the plaintiff to meet on a biweekly basis instead. Id. Venugopalan told the plaintiff to contact him if she ever needed assistance with any issues. Id. at ¶15.

Sometime around September 2011, because of physical space constraints, the Employee Development Program's office moved to a second-floor conference room close to Human Resources. Id. at ¶16. The plaintiff points out that the room had once been used for storage and had no windows. Dkt. No. 44 at ¶8. The plaintiff and one student or a limited-term employee worked in that space. Dkt. No. 35 at ¶16.

### 3. *Plaintiff's Request for a Raise*

The plaintiff sought a raise in February 2012 on the ground that she was paid less than people working in the IS Tech classification in the UITS Unit. Id. at ¶17. Venugopalan contacted a UITS administrator regarding the UITS salary information the plaintiff had supplied. Id. at ¶19. He learned that the information provided by the plaintiff showed salary information for positions that had been broad-banded by the Office of State Employment relations in order to give hiring authorities more flexibility in hiring and retaining employees. Id. Venugopalan also spoke to UWM's Manager of Classified Services in Human Resources, who said that UITS positions created, managed and monitored very large systems, in contrast to the smaller, web-based MyDev program the plaintiff was managing. Id. at ¶20. Employees in UITS had the same title as the plaintiff but generally were paid more. Id. at ¶21.

Venugopalan asked Human Resources to look at the position descriptions to determine whether the plaintiff's job duties were similar to those employees who were paid more. Id. The plaintiff does not dispute that a job title, in itself, does not explain the extent of a person's duties and people with the same title may perform completely different tasks with different levels of responsibility and may possess vastly different skills. Dkt. No. 48 at ¶27. Similarly, the plaintiff admits that UWM was experiencing financial difficulties at that time. Id. at ¶29. Venugopalan was not aware of any employee whose responsibilities did not increase significantly receiving a salary increase at that time. Dkt. No. 35 at ¶23. The plaintiff did not receive a raise. Id. at ¶22.

In early April 2012, the plaintiff requested that a vacancy in the Employee Development Program be filled with a limited-term employee (LTE). Id. at ¶29. All LTE positions must be submitted to and approved by the Provost. Id. The Provost approved the plaintiff's request and the plaintiff hired an LTE scheduled to begin work on May 29, 2012. Id. The plaintiff's job duties during this period involved frequent meetings with MyDev users on campus to help them with the program, attending business development meetings on campus, and talking with people over the phone. Dkt. Nos. 42 at 12; 52 at ¶31.

4. *Task Force Convened*

In February 2012, Provost Johannes Britz appointed a task force to examine the effectiveness of three units within Academic Affairs: the Center for Instruction & Professional Development (CIPD), the Learning Technology Center (LTC), and the Employee Development Program. Dkt. No. 35 at ¶30. The task force was named the CIPD/LTC/MyDev Task Force after the programs it was evaluating. Id. at ¶31. The task force consisted of employees Phyllis King, Jean Salzer, Laura Pedrick, Susan Stalewski, Nicholas Proferes, Kat Ganski and Venugopalan. Id. at ¶32. The plaintiff and the directors of CIPD and LTC were not members of the task force, nor were any employees of CIPD or LTC. Id. at ¶33. The task force convened several meetings, received recommendations from a focus group, reviewed national best practices in the relevant areas and employed an outside consultant to spend two days interviewing various constituent groups and staff on campus. Id. at ¶31.

On October 15, 2012, the task force issued its report, recommending, among other things, that the Employee Development Program be moved into the Human Resources Department within the FAA. Dkt. Nos. 35 at ¶34; 35-7. The task force also recommended that the Director of Human Resources be tasked with "leading a committee (in conjunction with the *Best Place to Work* Initiative) that would provide campus with opportunities for leadership and professional development training." Id. The task force also made several recommendations regarding the two other units within Academic Affairs—CIPD and LTC, and suggested that an advisory board should consider long-term changes in all three units. Dkt. Nos. 35 at ¶35; 35-7.

5. *The Plaintiff's Discrimination Complaint*

On April 12, 2012—two months after Britz formed the task force to evaluate the effectiveness of the Employee Development Program—the plaintiff filed a complaint with UWM's Equity/Diversity Services (EDS) alleging that her supervisor, Venugopalan, and Britz were discriminating against her on the basis of sex/gender. Dkt. No. 35 at ¶24; 35-4. She alleged that she had to assume some of Taylorboyd's responsibilities after Taylorboyd retired, that Venugopalan and Britz did not appreciate her contributions, that they did not provide her with feedback, that she was unsure of the continuation of the Employee Development Program and that she was entitled to additional pay as compared to male colleagues working for the University information and Technology Services. Dkt. No. 35 at ¶25; 35-4.

On August 31, 2012, EDS issued a determination finding insufficient evidence to support a finding of sex and/or gender discrimination Dkt. Nos. 35 at ¶26; 35-5. The determination stated that EDS interviewed the plaintiff, Venugopalan, Britz and one other employee (who was not named in the decision) who chaired the CIPD/LTC/MyDev Task Force. Dkt. Nos. 35 at ¶27; 35-5 at 2. The determination stated that EDS also reviewed documents submitted by the plaintiff, including her position description, performance evaluation, and a list of additional duties assumed following her supervisor's retirement. Id. The plaintiff did not appeal the EDS's decision, and then-Chancellor Lovell issued a final determination finding no evidence of sex or gender discrimination. Dkt. No. 35-6.

The plaintiff concedes that Britz did not do anything to overtly discriminate against her, but she believes he did not take her EDS complaint seriously. Dkt. No. 42 at 20-21. On the other hand, she feels Venugopalan discriminated against her because he was dismissive of what she did, was too busy to meet with her, and (she believes) disregarded her request for a raise. Id. at 21.

6.     *Internal Reorganization*

In February 2013, Human Resources reorganized internally and created the Organizational Development Unit, overseen by Shannon Brandbury, UWM Employment Relations Manager. Dkt. No. 39 at ¶5. The Organizational Development Unit was tasked with providing supervisory and managerial training among other campus training initiatives. Id. It was to consist of three

12

employees: an HR training coordinator position, a (vacant) Director position (to assume Taylorboyd's duties) and the plaintiff. Id.

On February 25, 2013, the Employee Development Program officially transferred into Human Resources and was absorbed into the Organizational Development Unit, which came to be known as Professional Development and Education, or PDE. Id. at ¶6. In the new unit, the plaintiff continued to primarily work with MyDev. Id. at ¶7.

That same day, Bradbury and Weslow (the HR Director), met with the plaintiff and asked her to prepare a list of projects she was working on related to MyDev. Dkt. Nos. 39 at ¶8; 38 at ¶3. They also asked the plaintiff to explore other alternatives to using MyDev. Dkt. No. 39 at ¶9. Weslow communicated to Vice Chancellor Van Harpen that the plaintiff appeared unwilling to evaluate MyDev's effectiveness. Dkt. No. 36 at ¶10.

Several months later, Human Resources hired Ann Rudolph as Training Manager and to directly supervise the plaintiff and one other employee. Dkt. Nos. 39 at ¶10; 38 at ¶4. Rudolph's work was not up to standards and, around the beginning of September 2013, Bradbury gave Rudolph a critical performance evaluation; Rudolph quit the next day or soon thereafter. Dkt. Nos. 38 at ¶6; 39 at ¶11. UWM never hired a replacement for Rudolph's position. Dkt. No. 38 at ¶19.

On September 2, 2013, over five months after it was requested, the plaintiff provided a list of MyDev-related projects on which she was working. Dkt. No. 39 at ¶13. The list did not include all of the functionality of projects

that were supported by MyDev and there were no projects or services on the list for Human Resources, id.; the plaintiff insists that none of those items were requested, dkt. no. 48 at ¶55.

       7.   *Audit*

On September 6, 2013, Bradbury and Weslow decided that MyDev—by then, almost ten years old—should be studied by someone outside of Human Resources. Dkt. No. 39 at ¶¶14, 15. Weslow had been informed that other new software options may have existed that provided similar functions to MyDev. Id. at ¶15. Information technology had been changing rapidly since 2010. Dkt. No. 42 at 5. While people still used cold fusion at UWM for things such as the UWM Undergraduate Catalog, the Schedule of Classes and Experts Directory, UWM had made the decision to utilize other software. Dkt. Nos. 34 at ¶39; 48 at ¶39.

Weslow said that she and Bradbury decided to have someone outside of HR study MyDev because she needed an honest assessment of the tool by a neutral person. Dkt. No. 39 at ¶14. At that time, the plaintiff was the only UWM employee trained to sufficiently maintain MyDev, and this posed a concern to Bradbury and Weslow from an operations perspective. Dkt. No. 39 at ¶16. The plaintiff acknowledges that an audit was done, dkt. no. 48 at ¶61, but maintains that the decision to decommission MyDev was made at least as early as August 21, 2013 (two weeks before the date Weslow says she and Bradbury made the decision), dkt. nos. 45 at ¶3; 45-2.

On September 9, 2013, Weslow received permission to engage UWM employee Mark Jacobson, an IS Supervisor 2 in UITS, to study the effectiveness of MyDev. Dkt. No. 39 at ¶17. Jacobson, who attended UWM for graphic design, worked for several years conducting Web work and owned a company supporting a health care company. Dkt. No. 37 at ¶3. He started at UWM in IT doing web work in 2003. Id. As the acting Director of UITS, Jacobson supported a number of the UWM web platforms, including UWM.edu and a number of custom applications that the schools, colleges and administrative departments use. Id. Jacobson supervised about ten full-time staff and ten student employees. Id. His team worked in design and coding, and they ran all of the servers that support UWM.edu websites. Id. He had conducted audits of other web-based technologies for UWM in the past as part of his job responsibilities. Id. at ¶7.

In September 2013, Jacobson received an email requesting that he conduct an independent technical assessment of the MyDev Tool and service. Id. at ¶4. Weslow wanted a technical analysis of MyDev, to consider whether MyDev was a viable platform and, if so, how long it would remain that way; she also wanted to know if there were other tools that could better suit UWM's needs. Dkt. No. 39 at ¶18; 39-2. Jacobson obtained MyDev's code. Dkt. No. 37 at ¶6. He and his staff then conducted a direct audit of the code and reviewed it against industry good practices. Id. They found numerous areas that needed improvement and standards that were not being met at all. Id. As of that time, neither Bradbury nor Jacobson were aware that the plaintiff had, over a year

15

earlier, submitted a discrimination complaint to EDS. Dkt. Nos. 38 at ¶8; 37 at ¶5.

Jacobson issued his review of MyDev on or about November 7, 2013. Dkt. Nos. 37 at ¶11; 37-1. As detailed in his report, Jacobson reviewed the structure and formatting of the underlying programming code of MyDev, comparing it to the technologies, standards, and best practices that had emerged in the last decade. Id. He reviewed MyDev for "general security, design principles, the technical infrastructure platform, and the ease of accessibility for users." Id.

Jacobson found that MyDev's programming was rudimentary and had not been upgraded, refined or redesigned based on evolving campus and industry technology best practices and standards. Dkt. Nos. 37 at ¶8; 37-1. This resulted in significant increases in the time required to perform maintenance, provide support and add enhancements. Id. Jacobson found the security for access to MyDev was defective and did not meet industry standards. Dkt. Nos. 37 at ¶9; 37-1. Any user with access to the application could view, edit or delete anyone else's data or trigger emails to any event registrants. Id. It was impossible to effectively identify whether someone had gained inappropriate access to the tool or if an attack on the tool was being attempted. Id. MyDev also lacked clear organizational and technical structure, with a significant number of redundant and outdated files. Id. It was not mobile device compatible, and it did not meet web accessibility standards. Id. After reviewing MyDev, Jacobson compared it to other technology that could

perform the same services and he detailed the results in a chart. Dkt. Nos. 37 at ¶10; 37-1.

Weslow reviewed Jacobson's report and discussed it with him. Dkt. No. 39 at ¶19. She concluded that MyDev was outdated and had been made obsolete by readily available open sources and licensed software options that better suited the university's needs. Id. Rudolph says it is her recollection that Bradbury and Weslow told her they were going to decommission MyDev before that time—sometime shortly after she began working for UWM in 2013. Dkt. No. 45 at ¶10. An August 21, 2013 email from Bradbury to Rudolph says that they were going to "sunset" MyDev. Dkt. Nos. 45 at ¶3; 45-2. Weslow never told Rudolph to terminate the plaintiff, dkt. no. 39 at ¶11, and Rudolph admits that neither Bradbury nor Weslow told her to fire the plaintiff, dkt no. 45 at ¶6.

In any event, Weslow recommended to Vice Chancellor Van Harpen that the campus consider other applications and phase out MyDev. Dkt. No. 39 at ¶20. On January 31, 2014, Van Harpen sent a memo to all current users of MyDev, as well as all UWM deans and division heads, explaining that MyDev would be transitioned to a web content management tool called WordPress. Id. at ¶21.

Those involved in the decision making submitted evidence regarding their experiences with MyDev. Around 2011, when Van Harpen was still working in legal affairs, she was involved in developing an online training through MyDev. Dkt. No. 36 at ¶13. Van Harpen and her staff found working with MyDev to be

challenging and she believed that that MyDev was becoming clunky and outdated in comparison to other available IT solutions. Id.

Similarly, Venugopalan had learned over time from UITS that they were not going to support cold fusion on their platform. Dkt. No. 35 at ¶37. In addition, the web-based application that supported the faculty mentoring program that the plaintiff created was not being updated. Id. at ¶38. There were people listed in the application as either eligible mentors or mentees who had died or who had left the university years before. Id. Venugopalan found the data in the application that the plaintiff had maintained to be unreliable and he had to keep track of the mentoring arrangements manually on a spreadsheet. Id. Venugopalan also received complaints from people about not being able to post events on MyDev and that the plaintiff would fix the problems on a case-by-case basis. Id. at ¶39. Venugopalan felt that MyDev was no longer working for UWM's needs. Id. The plaintiff acknowledges that it is not unusual for software to become outdated. Dkt. Nos. 35 at ¶39; 48 at ¶105.

The plaintiff denies that MyDev was completely replaced and denies that no one used it after it was decommissioned. Dkt. Nos. 44 at ¶6; 48 at ¶12. It appears that the home page was available through September of 2016, dkt. no. 47 at ¶6, but the court located no evidence that UWM used MyDev after 2014.

8.    *The Plaintiff's FMLA Request/Request for Accommodation*

Soon after Jacobson began his audit, but before the final determination, the plaintiff called in sick to work. Dkt. Nos. 38 at ¶9; 40 at ¶3. On Monday, September 23, 2013, the plaintiff submitted a Family and Medical Leave

(FMLA) request with statement from a psychiatrist, who indicated that the plaintiff was unable to perform her job functions (specifically, "[a]ny function involving executive functions of the brain"). Dkt. No. 40-1. The doctor further indicated that the plaintiff had "no frustration tolerance, labile mood, sadness, anxiety, insomnia, inability to concentrate and easy distractibility." Id. The psychiatrist indicated that the period of incapacity would last until April 2014; the leave request form, however, asked for two weeks. Id.

On September 25, 2013, UWM approved the plaintiff for FMLA leave through December 12, 2013, which would exhaust the total amount of leave she was eligible for under the FMLA and WFMLA for 2013. Dkt. Nos. 40 at ¶4; 40-2; 38 at ¶10; 38-1. In addition, UWM approved a leave of absence using her accrued leave as provided by the Wisconsin Administrative Code §ER 18.14(2)(a). Id.

On October 9, 2013, the plaintiff emailed a Fitness for Duty Certification from a different doctor indicating that, as of October 12, 2013, she was able to work twenty hours per week from home. Dkt. No. 38 at ¶11. Bradbury responded to the plaintiff via email on October 10, 2013, informing her that, although her request to work from home was raised in the context of her FMLA leave, it was really a request for accommodation. Id. at ¶12. Bradbury provided the plaintiff with a copy of the UWM's disability Accommodation Request Form and asked her to complete it. Id.

On October 14, 2013, the plaintiff emailed Jason Kuiper, UWM's Disabilities in Employment Coordinator, a disability accommodation request

form asking that she be allowed to work a maximum of twenty hours per week from home. Dkt. Nos. 40 at ¶5; 10-3; 10-4. Kuiper responded four days later asking the plaintiff to furnish additional health care provider information. Dkt. Ns. 40 at ¶5; 40-4. As of October 18, 2013, Kuiper was not aware that the plaintiff had filed a discrimination complaint with the EDS back in April of 2012. Dkt. No. 40 at ¶6.

On November 5, 2013, Kuiper received a letter from the plaintiff's therapist, Rabbi Mitchell Cohen, indicating that the plaintiff had a myriad of specific emotional and psychological conditions, that the plaintiff had reported to him that her work environment was chaotic and toxic, and that she was unable to work in her office due to her supervisor's recent resignation. Dkt. Nos. 40 at ¶7; 40-5. The plaintiff never explained to Kuiper, in person or in writing, what made the work environment chaotic and toxic and she never provided concrete details. Dkt. No. 40 at ¶8. Rabbi Cohen indicated that the plaintiff had reported to him that her work environment was toxic because of mean spirited statements by her supervisor, and that such comments caused mental anguish and panic attacks. Dkt. Nos. 40 at ¶9; 40-5. He suggested that working from home on a sporadic basis would accommodate her health condition. Id. He proposed the schedule to last one month, after which time it could be reassessed. Id.

Upon receiving the accommodation request, Kuiper considered the medical information the plaintiff had provided, consulted with her immediate supervisor and reviewed her position description. Dkt. No. 40 at ¶10. He

responded to the plaintiff by letter dated November 21, 2012. Id. at ¶11. He stated his conclusion that she would not be able to perform the essential functions of her job without being present at UWM. Id. He went on to state:

> Specifically, there is little to no ability to supervise your work if it is performed at home, you need to interact face-to-face with your supervisor, peers and customers, you are expected to participate in campus user groups, teams and committees, and you must be able to handle immediately any problems that may arise with the Employee Development system. In addition, as you know, the Professional Development and Education (PDE) unit within the Department of Human Resources is a new entity (since February 2013), with newly assigned responsibilities from the Chancellor's Best Place to Work Initiative including supervisory training, augmented employee on-boarding, professional development, and leadership training. As part of the PDE team, your job responsibilities include working within HR to create and maintain PDE's offerings, and it is important that you be present at UWM to be part of this group effort.

Dkt. Nos. 40 at ¶11; 40-6.

Kuiper's November 21, 2013 letter also indicated that providing a stress-free environment was not a reasonable accommodation for the workplace. Dkt. Nos. 40 at ¶12; 40-6. Kuiper stated that it was difficult to respond to the allegations that the plaintiff's work environment was chaotic and toxic without specific details. Id. He suggested that the plaintiff submit a complaint to UWM's Office of Equity and Diversity Services (EDS) if she felt she was being discriminated against or harassed based on a protected characteristic. Id. At the same time, Kuiper offered the plaintiff the ability to leave work for appointments with her therapist as needed. Dkt. Nos. 40 at ¶13; 40-6. He also offered a temporary reduction in work hours using FMLA leave. Id. However, he

did not approve a complete fluid work schedule, such as working in the middle of the night, due to the need for reliable and predictable attendance. Id.

On November 25, 2013, Kuiper wrote to the plaintiff indicating that she could make a request for intermittent FMLA leave and/or reduced work week under the FMLA but it would only be approved provided that work occur on site at UWM during her regularly scheduled hours. Dkt. Nos. 40 at ¶14; 40-7.

On December 6, 2013, the plaintiff emailed Kuiper a Fitness for Duty Medical Certification, a new FMLA request and a new disability accommodation form. Dkt. Nos. 40 at ¶15; 40-8. In the new Disability Accommodation form, the plaintiff asked "to record any in-person meeting involving task assignments or status updates," to flex her schedule between 6 a.m. and 6 p.m. and to be able to work from various areas on the UWM campus outside of her assigned office. Id.

Kuiper responded to the plaintiff on December 10, 2013, indicating that, per her Fitness for Duty Medical Certification, she should return to work on December 13, 2013. Dkt. Nos. 40 at ¶16; 40-9. The letter granted her permission to attend medical appointments as needed and granted her request to record meetings. Id. The next day, Rabbi Cohen submitted a letter to Kuiper indicating that the "key aspect of [the plaintiff's] accommodation request [was] that it provides some flexibility to 'clear her head' and return to work duties after taking the necessary steps to control the episode." Dkt. Nos. 40 at ¶17; 40-10. The plaintiff returned to work on December 13, 2013, worked at her regular work station and performed her job functions. Dkt. No. 42 at 25.

On December 26, 2013, Kuiper responded to Rabbi Cohen seeking clarification on the types of accommodations being requested. Dkt. Nos. 40 at ¶18; 40-11. Rabbi Cohen responded on January 10, 2014, reiterating his request that the plaintiff work on campus but not in her regular office. Dkt. Nos. 40 at ¶19; 40-12. The plaintiff testified in her deposition that she asked to work outside of her workspace because sitting outside of Bradbury's office and listening to Bradbury gave the plaintiff acute anxiety. Dkt. No. 42 at 24. She also testified that she could perform her job anywhere away from Bradbury. Id.

Kuiper asked Weslow and Bradbury whether this request to work in an alternative office space was reasonable. Dkt. No. 40 at ¶20. They were amenable to moving her work station, but felt that it was not reasonable to have her work all over campus. Id. She needed to work in a particular place so she could have supervision. Id.

On January 14, 2014, Kuiper responded to the plaintiff's November 27, 2013 accommodation request. Dkt. Nos. 40 at ¶21; 40-13. He said that he was denying the plaintiff's request to work a flex schedule between 6 a.m. and 6 p.m. because her work required that she maintain a predictable schedule. Id. He determined that it was unreasonable to allow the plaintiff to change her hours daily at her discretion. Id. In his response, Kuiper denied the plaintiff's request to work somewhere other than her assigned workspace for lack of specificity as to what part of the plaintiff's working environment was problematic. Dkt. No. 40 at ¶22; 40-13. Kuiper's letter indicated that the plaintiff could use FMLA leave to "step back momentarily" from her work if she

was experiencing medical symptoms. Dkt. Nos. 40 at ¶23; 40-13. He also indicated that she could request to change her regularly scheduled work hours. Id.

9.     *The Decision to Lay Off the Plaintiff*

With the decommissioning of the MyDev Tool, the IS Comprehensive Services Specialist position—dedicated solely to support the tool—was no longer necessary. Dkt. No. 36 at ¶14. Decommissioning MyDev meant that the plaintiff's position at UWM was obsolete. Dkt. Nos. 39 at ¶22; 38 at ¶13. UWM needed to eliminate the position that supported the MyDev Tool and lay off an IS Comprehensive Services Specialist. Id.

Prior to her layoff date, the plaintiff had certain transfer, demotion and displacement rights available to her, which are detailed in Wis. Adm. Code Chapter ER-MRS 22 (Layoff Procedure) and Chapter 232 of the Wisconsin Human Sources Handbook (Layoff of Permanent Classified Employees). Dkt. Nos. 36 at ¶22; 36-2. Specifically, the plaintiff had mandatory restoration rights to a vacancy in her employing unit (UWM's Division of Finance & Administrative Affairs) at or closest to the same or counterpart pay range level from which she left, provided she was qualified to perform the work after being given customary orientation provided to newly hired workers in such a position. Dkt. Nos. 36 at ¶23; 36-2.

When considering the plaintiff's rights in the layoff process, Bradbury and Weslow sought to determine whether the plaintiff had the right to displace (or "bump") another employee with the same title and classification who worked

in the same business unit. Dkt. No. 38 at ¶15. They identified two potential such employees: Carla Sagert and Michael Enstrom. Id. The plaintiff had the most seniority of the three but Sagert and Enstrom were exempted from layoff for "special or superior skills" under Wis. Am. Code. §ER-MRS 22.06. Dkt. No. 36 at ¶16.

Sagert worked as the manager of all Information Systems in Human Resources (known as HRIS). Dkt. Nos. 36 at ¶17; 36-1. She was responsible for generating, coordinating and interpreting data that supported a wide variety of campus initiatives and projects. Id. She monitored HRIS for data security, validity, and accuracy. Id. Sagert's job required a thorough understanding of HRIS as it affects higher education. Id. Sagert worked and cooperated with other campus technical experts, guided the department's technical priorities, and managed up to three full-time staff members and, at times, other temporary and/or part-time staff. Dkt. Nos. 36 at ¶18; 36-1.

Enstrom was the FAA's Business Process Automation Project Leader. Dkt. Nos. 37 at ¶12; 36-16. He was responsible for leading teams on projects at UWM involving business process mapping and process improvements of the division, including processes that had campus-wide impact. Id. He collaborated with other campus technical experts, directed team efforts, provided business analysis, and facilitated implementation planning with a wide range of diverse stakeholders. Id. His projects included leading UWM's e-Workflow planning team and developing a request for proposal (RFP) for eWorkflow software. Id.

Weslow and Bradbury determined that the plaintiff did not have the skills necessary to perform Sagert's or Enstrom's job duties, nor could she obtain those skills within the two or three weeks of a customary orientation and training period. Dkt. Nos. 39 at ¶25; 38 at ¶18. Weslow and Bradbury concluded that the plaintiff was the appropriate employee to layoff under OSER's rules and regulations; they consulted with Vice Chancellor Van Harpen who also agreed with their analysis. Dkt. Nos. 39 at ¶26; 36 at ¶19. On January 31, 2014 prior to the layoff being effected, Weslow was replaced as HR Director by Elizabeth Forman in an interim capacity. Dkt. No. 36 at ¶19. Forman also was consulted and agreed that the plaintiff should be subject to the state's layoff rules. Dkt. Nos. 36 at ¶19; 39 at ¶26. In consultation with Weslow and UWM's Office of Legal Affairs, Bradbury issued the plaintiff an At-Risk letter on May 5, 2014. Dkt. Nos. 38 at ¶14; 38-2.

If the plaintiff believed that the layoff rules were improperly applied, she had the right to appeal the layoff decision to the Wisconsin Employee Rights Commission (WERC). Dkt. Nos. 36 at ¶21; 42 at 25. On June 6, 2014, the plaintiff was notified that she was being laid off from her position as an IS Comprehensive Services Specialist effective June 28, 2014. Dkt. Nos. 36 at ¶20; 36-2. As the plaintiff's position was part of the Wisconsin Civil Service system, it was subject to the Office of State Employment Relations (OSER) regulations regarding layoff. Id.

After the plaintiff's June 28, 2014 layoff date, she had certain reinstatement rights that allowed UWM to place her into a vacancy in the classified service at its discretion. Dkt. Nos. 36 at ¶24; 36-2.

On September 8, 2014, UWM began a recruitment for an Information Processing Consultant in the UWM Libraries. Dkt. No. 36 at ¶25; 36-3. This position was an Academic Staff position and not part of the State civil service system. Id. That meant that OSER's rules did not apply and that the plaintiff had no restoration rights or reinstatement eligibility to this position. Dkt. Nos. 36 at ¶25; 36-3. Consistent with its standard practices for Academic Staff recruitments, UWM formed a Search & Screen Committee for this position. Dkt. No. 36 at ¶26. Thirty-one individuals applied for the Information Processing Consultant position including the plaintiff. Dkt. Nos. 36 at ¶27; 36-4. The committee determined that the plaintiff was one of twenty-one applicants who did not meet the minimum requirements. Dkt. Nos. 36 at ¶27; 36-5.

On August 20, 2014, UWM began a recruitment for a Financial Specialist 4 for the Office of Budget and Planning in the Division of Finance and Administrative Affairs. Dkt. Nos. 36 at ¶28; 36-6. It was a state civil service position, but because the pay range was not the same or similar to the plaintiff's, she was not entitled to mandatory restoration. Dkt. No. 36 at ¶28. The Search & Screen Committee formed for the Financial Specialist 4 position concluded that the plaintiff was not qualified for the position because she had no financial experience. Dkt. No. 36 at ¶29; 36-7.

On September 3, 2014, UWM began to recruit for a Budget & Policy Analyst for the Office of Budget and Planning. Dkt. Nos. 36 at ¶30; 36-8. This was a state civil service position, but the plaintiff was not entitled to mandatory restoration because the pay range was not the same or similar to her former position. Dkt. No. 36 at 30. The Search & Screen Committee for the Budget & Policy Analyst position concluded that the plaintiff was not qualified for the position as she had no financial expertise. Dkt. Nos. 36 at ¶31; 36-9.

No member of the Search and Screen Committees involved in the evaluating the plaintiff's application for the Budget & Policy Analyst, Financial Specialist 4 or Processing Consultant positions would have had reason to know that the plaintiff was an individual with a disability or that she had previously filed an EEOC complaint against UWM. Dkt. No. 36 at ¶32. None of these individuals were involved with evaluating the plaintiff's accommodation requests when she was employed by UWM as an IS Comprehensive Services Specialist or with responding to her prior EEOC complaint against UWM. Id.

At the time the defendants filed their summary judgment motion, UWM had experienced a downsizing of its work force, was in year five of a six-year tuition freeze and had simultaneously experienced the largest cuts in state appropriations in UWM's history. Dkt. No. 36 at ¶12. Since 2011, enrollment had declined about twenty percent. Id. As a result of these factors, staffing levels had declined about ten percent over the previous three years. Id.

C. Staffing/Comparators

At the time of the plaintiff's layoff, there were six UWM employees with the OSER classification IS Comprehensive Service Specialist. Dkt. Nos. 36 at ¶35; 36-11.

| Name | Sex | Start Date in Specialist Position | Years in Position | Department | Rate as of June 2014 |
|------|-----|-----------------------------------|-------------------|------------|----------------------|
| Abraham, Molly | F | 10/11/09 | 4.7 | FAA-HR | $27.979 |
| Brockman, Kyle | M | 8/27/07 | 6.8 | FAA-UITS | $27.998 |
| Enstrom, Michael | M | 11/07/10 | 3.6 | FAA-Integrated Administrative Services | $41.268 |
| Kaja, Ricky | M | 12/20/04 | 5.3 | University Relations | $31.089 |
| Madson, Quinn | M | 6/18/07 | 5.3 | University Relations | $32.994 |
| Sagert, Carla | F | 7/1/12 | 2.0 | FAA-HR | $36.360 |

Id.

In her EDS complaint, the plaintiff asserted that she should be compared to Ricky Kaja and Quinn Madson, but both of those individuals worked in different departments in UWM. Dkt. No. 36 at ¶36. Madson was hired in June 2007 at a rate of $28.736. Dkt. Nos. 36 at ¶37; 36-11. His initial salary was higher than the plaintiff's for a number of reasons, including market competition at the time of hire, aggressive salary negotiations, experience, the specific requirements of the job in question (web and mobile application design

and development) and the fact that he was hired by a different unit than the plaintiff. Id.

Madson was promoted to IS Comprehensive Services Specialist on March 15, 2009, a few months before the plaintiff. Dkt. Nos. 37 at ¶13; 36-11. At the time, Madson required a pay increase of $2.021, which was slightly less than the increase the plaintiff received for similar promotion. Madson's job duties differed significantly from the plaintiff's. Dkt. Nos. 37 at ¶14; 36-14. Madson was hired as a web application developer and a web development technical lead. Id. His primary duties included working with a wide variety of campus clients on web design coordination and consultation, and the production of web applications and mobile applications. Id. He was responsible for developing and promoting security best practices for web application development, and promoting best practices for technical infrastructure and application design standards for use by technical staff from UITS and other campus divisions. Id.

Kaja was a web applications developer for the Web and Mobile Design unit and performed duties similar to Madson. Dkt. Nos. 36 at ¶38; 36-13. At the time of his hire, Kaja's starting salary was $0.893 higher than the plaintiff's. Id. This difference is attributable to a number of factors, including market conditions at the time of hire, salary negotiations, experience, the job requirements (web and mobile app design and development) and the fact that he was hired by a different unit than the plaintiff. Dkt. Nos. 36 at ¶38; 36-13.

When Kaja was hired, the factors affecting his salary included (1) a comparative salary analysis of nine similar positions to the IS Comprehensive

Services Senior position compiled by Jacobson from a variety of salary surveys; (2) Kaja's skills and abilities, and (3) reference to the salaries of other individuals in the unit. Dkt. No. 37 at ¶15.

Kaja received a Discretionary Compensation Adjustment on February 3, 2008, in the amount of $2.516. Dkt. Nos. 36 at ¶39; 36-15. The reason for this increase was market competition and compression. Id. Specifically, it was an attempt to bring Kaja's salary in line with Madson's as they worked in the same unit and were performing very similar work.

The other three IS Comprehensive Services Specialists employed by UWM at the time of the plaintiff's layoff were hired directly into the IS Comprehensive Services Specialist position and so were not subject to OSER's limit on the amount of pay increase when promoting with a series. Dkt. No. 36 at ¶40. As a result, they had substantially more latitude to negotiate their starting pay-rate, including taking into consideration their specific job duties and market factors. Id.

Finally, Enstrom and Sagert were employed by the same employing unit as the plaintiff, but both performed substantially different jobs. Enstrom's and Sagert's positions required a much higher degree of technical skill that the plaintiff's. Dkt. Nos. 36 at ¶41; 36-16; 37 at ¶16.

## III.    Conclusions of Law

A.    Title VII Discrimination

The plaintiff has alleged two types of claims under Title VII: gender discrimination and retaliation. Before turning to the merits of each claim, the

31

court notes that the plaintiff named five individual defendants in her second amended complaint—Weslow, Bradbury, Venugopalan, Britz and Kuiper. Dkt. No. 16. Title VII does not impose individual or supervisory liability; a plaintiff suing under Title VII may sue only those meeting the statutory definition of "employer." Thanongsinh v. Bd. of Educ., 462 F.3d 762, 772 n.7 (7th Cir. 2006). The court will dismiss the plaintiff's Title VII claims against Weslow, Bradbury, Venugopalan, Britz and Kuiper in their individual capacities.

1.    *Sex Discrimination*

Title VII prohibits intentional discrimination in employment on the basis of statutorily proscribed factors, including sex. Joll v. Valpraraiso Community Schools, No. 18-3630, 2020 WL 1316688, *5 (7th Cir. Mar. 20, 2020). The sole question is causation: whether the defendant made the decision to lay off the plaintiff because of sex. The plaintiff can rely on direct or circumstantial evidence of causation. Id. (citing Ortiz v. Werner Enterprises, Inc., 834 F.3d 760, 764-54 (7th Cir. 2016). Circumstantial evidence includes ambiguous or suggestive comments or conduct, better treatment of people similarly situated but for the protected characteristic and dishonest employer justifications for disparate treatment. Id. (citing Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994)).

A plaintiff can also utilize the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. (citing Coleman v. Donahoe, 667 F.3d 835, 863 (7th Cir. 2012). A plaintiff using this framework has the initial burden of establishing that she (1) belonged to a protected class; (2) met

her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was similarly situated to other employees who were not members of the protected class and were treated better. <u>David v. Bd. of Trs. of Cmty. Coll. Dist. No. 50</u>, 846 F.3d 216, 225 (7th Cir. 2017). If the plaintiff satisfies that burden, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. <u>Id.</u> At that point, the burden shifts back to the plaintiff to show that the employer's explanation is pretextual. <u>Id.</u> Regardless of how the plaintiff chooses to proceed, the court on summary judgment must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of her sex.

The defendant moved for summary judgment on the ground that it had a legitimate, nondiscriminatory reason for the decision to layoff the plaintiff. The plaintiff's primary job duty between 2004-2014 was to create and maintain the MyDev software program, using a language called cold fusion. Over the course of ten years, the defendant shifted toward web-based programs and multiple people expressed concerns about the long-term viability of MyDev. The defendants convened a task force to evaluate three departments, including MyDev, *before* the plaintiff filed a discrimination complaint. Jacobson, who knew nothing of the plaintiff's discrimination complaint—and who is not accused of discriminating against the plaintiff—conducted an independent audit with his staff and identified significant concerns with the program. Once

the decision was made to sunset MyDev, the plaintiff's position became obsolete.

The defendant readily acknowledges that under the civil service program, the plaintiff could have displaced another employee if she could perform that employee's duties after customary orientation and training. Bradbury identified two possible employees—Sagert and Enstrom—and determined that the plaintiff could not take over either position with customary orientation and training. Both Sagert and Enstrom had specialized duties. Sagert managed all Information Systems in Human Resources, meaning that she generated, coordinated and interpreted data for a wide variety of campus initiatives and projects. She also monitored HRIS for data security, validity, and accuracy with other campus technical experts, guided the department's technical priorities, and managed up to three full-time staff members and at times other temporary and/or part-time staff. Enstrom was the FAA's Business Process Automation Leader responsible for leading teams on projects at UWM involving business process mapping and process improvements for the Division. He collaborated with campus technical experts, directed team efforts, provided business analysis, and facilitates implementation planning with a wide range of diverse stakeholders. He led UWM's e-Workflow planning team and developed a request for proposal for eWorkflow software.

In her opposition to the summary judgment motion, the plaintiff didn't respond to any of these arguments. Her opposition brief mentions sex discrimination once—in a heading—but the body of the brief discusses Title VII

34

*retaliation.* Dkt. No. 43 at 5. The burden is on the plaintiff to come forward with some evidence in opposition to summary judgment to support her claim that the defendants discriminated against her based on sex. She could have relied on direct or circumstantial evidence, but she had to present *some* evidence to show the court that the defendant made its layoff decision because of her sex.

The plaintiff admits that she filed a sex discrimination complaint in 2012 naming Britz and Venugopalan. Dkt. No. 52 at ¶40. She also admits that Britz did nothing to overtly discriminate against her—he simply refused to take her complaint seriously. Id. at ¶45. She testified in her deposition that Venugopalan allegedly discriminated against her because he was dismissive of what she did, was too busy to meet with her and (she believed) disregarded her request for a raise. Dkt. No. 42 at 21. Without something in the record that ties the defendant's decision to the plaintiff's sex, the court must grant the defendant's motion for summary judgment on the Title VII gender discrimination claim.

2.     *Retaliation*

The second amended complaint and brief in opposition to summary judgment blur legal theories, but the heart of the plaintiff's claims appears to be her belief that her employer retaliated against her for exercising her rights under Title VII. In opposing summary judgment, the plaintiff says that "[t]he claims for which [she] has the best evidence are her claims that she was targeted for layoff beginning in 2013 because she had filed a discrimination complaint in mid-2012, and that in late 2013 she was denied accommodations

35

for her disabilities. Her employment ended when she was laid off in June 2014." Dkt. No. 43 at 1. The plaintiff appears to contend that this "best evidence" supports her retaliation theory.

Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). The plaintiff can choose to prove her claim through either the direct or indirect methods of proof. Poullard v. McDonald, 829 F.3d 844, 856 (7th Cir. 2016). The direct method requires proof that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two. Id. The indirect method requires her to show the same first two elements that she must show in the indirect method. Id. "To complete [the] *prima facie* case and move on to the issue of pretext, [she] also would need to offer evidence that [she] met the department's legitimate expectations and that [she] was treated less favorably than similarly situated employees who did not engage in protected activity." Id. Under either approach, the court asks whether a reasonable trier of fact could infer retaliation. Id.

The court must consider all the evidence in the record when reviewing the retaliation claim. The plaintiff filed an internal complaint of discrimination on April 12, 2012, requested accommodations for a disability in 2013 and was laid off in June of 2014. The issue is causation—"whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse

employment action," considering the evidence "as a whole." <u>Ortiz</u>, 834 F.3d at 765. Factors to consider in this analysis include suspicious timing, ambiguous statements of animus, whether other employees were treated differently or evidence that the explanation for the adverse employment action was pretextual. <u>Greengrass v. Int'l Monetary Sys., Ltd.</u>, 776 F.3d 481, 486 (7th Cir. 2015).

The defendants again point to their legitimate, nondiscriminatory reason for the plaintiff's layoff: the decommissioning of MyDev. The task force convened two months before the plaintiff filed an internal complaint. The task force determined that the Employee Development program should move into Human Resources, and that the director of Human Resources asked IT to study the effectiveness of MyDev. Jacobson conducted the independent audit, knowing nothing about a prior internal complaint filed by the plaintiff. UWM no longer supported the MyDev platform, it hadn't been updated and it raised security concerns. The task force led to an independent audit by someone who had no decision-making authority with respect to MyDev or the plaintiff's position.

Jacobson found that security access to MyDev was defective and did not meet industry standards. Dkt. No. 37 at ¶9. Any user with access to the application could view, edit or delete anyone else's data or trigger emails to any events registrants. <u>Id</u>. It was impossible to effectively identify whether someone had gained inappropriate access to the tool or if an attack on the tool was being attempted. <u>Id.</u> MyDev lacked clear organizational and technical structure, with

a significant number of redundant and outdated files. Id. It was not mobile device compatible and did not meet web accessibility standards. Id.

Significantly, the plaintiff admits that with the decommissioning of the MyDev tool, the IS Comprehensive Services Specialist position that was dedicated solely to supporting that tool was no longer necessary. Dkt. No. 52 at ¶106. She also admits that UWM needed to eliminate the position that supported the MyDev Tool and lay off an IS Comprehensive Services Specialist. Id.

Despite these admissions, the plaintiff relies on two pieces of evidence in opposition to summary judgment. First, she argues timing: she filed a discrimination complaint, she asked for accommodations and the defendant terminated her position. Second, she relies on the declaration of Ann Rudolph, the person who briefly supervised the plaintiff after Weslow and Bradbury took over the department. According to Rudolph, Bradbury planned to decommission MyDev before the audit concluded. The plaintiff also points to what is missing from the record—neither Vice Chancellor Van Harpen nor the Human Resources Director Sue Weslow provided declarations indicating that they did not know the plaintiff had filed a discrimination complaint.

The period between the plaintiff's protected activity and the decision to lay her off is too long to raise an inference of causation. The layoff occurred almost twenty-five months after the plaintiff filed her EDS complaint. Carter v. Chi. State Univ., 778 F.3d 651, 658 (7th Cir. 2015) (holding a temporal proximity of seven months was not suspicious); Naficy v. Ill. Dep. of Human

Servs., 697 F.3d 504, 513 (7th Cir. 2012) (holding nine-month gap did "little to raise suspicion"); Jajeh v. Cty. of Cook, 678 F.3d 560, 570 (7th Cir. 2012) (concluding that a five month gap between protected activity and adverse action did not amount to suspicious timing). And there were intervening factors—Jacobson's conclusions and the determination to decommission MyDev and eliminate the IS Comprehensive Services Specialist position that supported it.

The court also has considered the timing in connection with the Rudolph declaration. Rudolph provided an email dated August 21, 2013 from Bradbury; in the context of discussing what the plaintiff should be doing with her time, Bradbury stated as of that date "we *are* going to sunset MyDev." Dkt. No. 45-2. At paragraph six of her declaration, Rudolph said that while Bradbury never told her to discharge the plaintiff, Bradbury "repeatedly" told her that MyDev was going to sunset and that that the plaintiff was difficult to work with. Dkt. No. 45 at ¶6. Rudolph stated that it was "implied that by ending [the plaintiff's] management of myDev that her employment would be eliminated, and that I needed to deal with her past and current problems in order to eliminate that employment." Id. In her declaration, Bradbury attested that as of September 9, 2013, she was not aware that the plaintiff had filed an internal discrimination complaint over a year earlier. Dkt. No. 38 at ¶8. The plaintiff does not dispute that Weslow never told Rudolph to terminate the plaintiff. Dkt. No. 52 at ¶56.

It is not clear to the court why the plaintiff believes that this timing sequence—an email from Bradbury dated August 21, 2013, indicating that

MyDev was going to sunset, coupled with undisputed assertions that Bradbury didn't know about the plaintiff's discrimination complaint filed a year earlier and the fact that Weslow didn't tell Rudolph to fire the plaintiff—shows that the June 28, 2014 layoff was caused by retaliation for filing the discrimination claim in 2012. The plaintiff filed the internal complaint over two years before the defendant eliminated her position. The plaintiff does not dispute that the decommissioning of MyDev eliminated the need for her position. Perhaps the plaintiff means to argue that the decommissioning of MyDev was the retaliatory act. But plaintiff has not presented any record evidence refuting the design flaws and findings of the audit by Jacobson. Again, Bradbury did not know the plaintiff had filed a complaint in 2012 and it was VanHarpen's decision—not Bradbury's—to sunset MyDev on January 31, 2014.

The plaintiff might have been able to identify a genuine issue of material fact had there been evidence that (1) defendants made the decision to sunset MyDev in order to eliminate the plaintiff's position and (2) this occurred before the defendants convened the CIPD/LTC/MyDev task force in February 2012. The court could not locate any such evidence in the record. When Britz convened the task force, he staffed it with people who had no decision-making authority with respect to the plaintiff. That task force recommended that the Employee Development Program move into Human Resources. After the move, Weslow and Bradbury asked the plaintiff to prepare a list of projects she was working on and it took five months for the plaintiff to respond. Dkt. No. 52 at ¶¶50, 55. Only then did Bradbury and Weslow decide that MyDev should be

40

studied by someone outside of the Human Resources Department. Weslow then called for the audit by Jacobson, who had nothing to do with the ultimate decision to sunset MyDev or lay off the plaintiff.

Nor could the court locate evidence suggesting that Weslow or Bradbury—or even VanHarpen—interfered with Jacobson's factfinding or that they attempted to sway the outcome of Jacobson's report. Jacobson's November 7, 2013 report made specific findings regarding MyDev's organizational and technical structure, redundant and outdated files and noncompliance with web accessibility standards.

The plaintiff's claims are based on assumptions and speculation. The facts that the plaintiff filed an internal complaint in 2012 and was let go in 2014 do not raise genuine issues of material fact as to whether the internal complaint was the cause of the layoff; no reasonable jury could conclude that the defendants decommissioned ten-year-old, deficient software in retaliation against the plaintiff because she had filed a complaint years before. The court will grant summary judgment on this claim.

B.     FMLA, Rehabilitation Act and ADA

The plaintiff's FMLA, Rehabilitation Act and ADA claims appear together in two paragraphs of the second amended complaint. Dkt. No. 16 at ¶¶47, 48. She alleges that the defendants violated her rights under the ADA and the Rehabilitation Act by refusing to allow her to return to work after her leave, refusing to provide her with accommodations and discharging her because of her disabilities. Id. at ¶47. The plaintiff also alleges that the defendants

interfered with her FMLA rights and retaliated against her for exercising those rights by failing to offer or suggest alternative accommodations. Id. at ¶48. In opposition to summary judgment, the plaintiff frames her claims as a single failure-to-accommodate claim. Dkt. No. 43 at 10. The plaintiff explains that the defendants violated the ADA when they forced her to "take an extended leave instead of engaging in the interactive process and providing her with accommodations adequate for her to return to work." Id. at 11.

The ADA prohibits any entity from discriminating against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The Rehabilitation Act prohibits discrimination against a "qualified individual with a disability . . . solely by reason of her or his disability." 29 U.S.C. § 794(a); see Monroe v. Ind. Dep't of Transp., 871 F.3d 495, 504-05 (7th Cir. 2017). "Aside from the 'solely by reason of' standard of causation . . . the Rehabilitation Act incorporates the standards applicable to Title I of the ADA." Id. Under the Rehabilitation Act, a plaintiff can establish disability discrimination in "three different ways: '(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people.'" A.H. ex rel. Holzmueller v. Ill. High School Ass'n., 881 F.3d 587, 592-93 (7th Cir. 2018) (quoting Washington v. Ind. High Sch. Athletic Ass'n, Inc., 181 F.3d 840, 847 (7th Cir. 1999)).

The plaintiff's failure-to-accommodate theory requires a showing that (1) she "was a qualified individual with a disability," (2) her employer "was aware of her disability," and (3) the employer "failed to reasonably accommodate her

disability." Yochim v. Carson, 935 F.3d 586, 590 (7th Cir. 2019). "The

accommodation obligation . . . brings with it a requirement that both the

employer and the employee engage in a flexible 'interactive process' and make a

'good faith effort' to determine what accommodations are necessary." Id. at 591

(quoting Lawler v. Peoria Sch. Dist. No. 150, 837 F.3d 779, 786 (7th Cir.

2016)). An employer need only provide a "reasonable accommodation, not the

accommodation [the employee] would prefer." Id. (quoting Hoppe v. Lewis Univ.,

692 F.3d 833, 840 (7th Cir. 2012)).

The parties agree that the plaintiff was a qualified individual with a

disability and that the defendants knew of her disability. The question is

whether the defendants failed to reasonably accommodate that disability. The

facts are largely undisputed, which allows this court to resolve the matter on

summary judgment.

On September 20, 2013, two weeks after Weslow engaged Jacobson to

study the effectiveness of MyDev, the plaintiff called in sick. Dkt. No. 52 at ¶64.

The doctor completing the FMLA form estimated that the plaintiff's incapacity

would last through April 2014—approximately seven months. Dkt. No. 40-1 at

3. The defendants approved the leave through December 12, 2013, which

would have exhausted the plaintiff's eligible leave under the FMLA and WFMLA

for 2013. Dkt. No. 52 at ¶65.

After that point, the defendants engaged in the "flexible, interactive

accommodation process" contemplated by the Rehabilitation Act and the ADA.

See Rehling v. City of Chi., 207 F.3d 1009, 1015 (7th Cir. 2000). In her second

amended complaint the plaintiff alleged that the defendants interfered with her FMLA when she tried to return to work early. The record evidence contradicts those allegations. The plaintiff emailed a Fitness for Duty Certification from a different doctor on October 9, 2013 saying that she could work twenty hours per week from home. Dkt. No. 52 at ¶66. The next day, Bradbury responded that, although the plaintiff had raised this proposal in the context of FMLA leave, it was really a request for accommodation, and he provided a copy of the defendants' disability Accommodation Request Form and asked the plaintiff to complete it. Id. at ¶67.

The defendants responded to each of the plaintiff's requests, granting some of the requested accommodations, rejecting some and offering others. The plaintiff emailed Kuiper, the defendants' Disabilities in Employment Coordinator, on October 14, 2013, asking to work twenty hours per week from home. Id. at ¶68. Kuiper, who did not know that the plaintiff had filed a discrimination complaint in 2012, dkt. no. 40 at ¶6, asked for additional healthcare provider information, dkt. no. 52 at ¶68. The plaintiff did not provide that information until November 5, 2018. Id. at ¶70. The information provided said that the plaintiff felt the environment was chaotic and toxic, but the plaintiff admits that she never provided concrete details about what it was that made her work environment chaotic and toxic. Id. at ¶¶70, 71.

Kuiper considered the information provided, consulted with the plaintiff's supervisor and reviewed the plaintiff's position description before responding to

the plaintiff on November 21, 2013. Id. at ¶¶, 73, 74. In denying the plaintiff's

request, Kuiper explained:

> After review of your position description and discussion of your job duties with your Department, I am denying your request to work from home as you are unable to perform the essential functions of your job without being present at UWM. Specifically, there is little to no ability to supervise your work if it is performed at home, you need to interact fact-to-face with your supervisor, peers and customers, you are expected to participate in campus user groups, teams and committees, and you must be able to handle immediately an problems that may arise with the Employee Development system. In addition, as you know, the Professional Development and Education (PDE) unit with the Department of Human Resources is a new entity (since February 2013) with newly assigned responsibilities from the Chancellor's Best Place to Work Initiative, including supervisory training, augmented employee on-boarding, professional development, and leadership training. As part of the PDE team, your job responsibilities include working with HR to create and maintain PDE's offering and it is important that you be present at UWM to be part of this group effort.

Dkt. Nos. 52 at ¶74; 40-6.

The plaintiff has not refuted the reasons given by Kuiper. The plaintiff

filed the declaration of a former UWM employee, Steven Premeau, who worked

in several different departments during his time at UWM. Dkt. No. 47. Premeau

said that when he worked for the defendants as an IT professional, he was able

to work from home one day a week from 2007 to 2009 and on Wednesday

afternoons from 2010 to 2017. Dkt. No. 47 at ¶9. He also asserted that UWM

still used cold fusion to create some publications, id. at ¶7, identified others

who'd worked remotely, id. at ¶¶10-11, and "recalled" that "when other IT

professionals' positions became obsolete, they were offered positions as service

managers," id. at ¶12. This proffered testimony does not refute Kuiper's

conclusions about the tasks performed by the *plaintiff* and the need for her to

be on campus. Premeau does not attest that he performed a job similar to the plaintiff, outside of his assertion that he worked remotely while working "as an IT professional."

In Kuiper's November 21, 2013 letter, he offered the plaintiff alternative accommodations such as the ability to leave twice a week for appointments with her doctor once her leave was exhausted. Dkt. No. 40-6. He also offered her a temporary reduction in hours using FMLA leave, with an opportunity to request other accommodations if she used all of her leave and still needed a reduced schedule. Id. To the extent that the plaintiff asked to be able to work a fluid schedule, Kuiper denied the request because the plaintiff's position required reliable and predictable attendance during work hours to interact with her supervisor, peers and customers. Id.

The plaintiff filed a new Fitness for Duty Medical Certification on December 6, 2013, asking to record any in-person meeting involving task assignments or status updates, to flex her schedule between 6 a.m. and 6 p.m. and to be able to work on campus outside of her assigned office. Dkt. No. 52 at ¶78. Kuiper responded four days later that the plaintiff should return to work on December 13, 2013, but that he would allow her to attend medical appointments as needed. Id. at ¶79. He also granted her request to record meetings. Id. The plaintiff returned to work.

Rabbi Cohen sent a letter on the plaintiff's behalf on December 11, 2013, indicating that the "key aspect" of the plaintiff's accommodation request is that she have flexibility to "clear her head." Id. at ¶80. Kuiper responded to Rabbi

Cohen on December 26, 2013, asking for clarification on the accommodations request. Id. at ¶82. Rabbi Cohen responded January 10, 2014, asking that the plaintiff be given the ability to work on campus but in another office. Id. at ¶83. Kuiper followed up with Bradbury and Weslow, who said that the plaintiff could move her work station but had to be somewhere where she would have supervision. Id. at ¶85.

Kuiper responded within four days, denying the plaintiff's request for a flexible schedule and the ability to work somewhere else because of a lack of specificity. Id. at ¶¶86, 87. However, he offered the plaintiff the ability to "step back momentarily" from her work if she was having symptoms and said that she could request to change her regularly scheduled hours. Id. at ¶88.

The question is whether a reasonable jury could conclude that the defendants did not act reasonably in denying the request to work elsewhere on campus or to work from home. The court evaluates that question mindful that the plaintiff needed to be able to meet the essential functions of the job. 42 U.S.C. ¶12112(8). The defendants granted the plaintiff FMLA leave, allowed her to attend all appointments and temporarily reduce hours if necessary, and granted her request to record meetings.

The plaintiff's substantive response to the defendant's motion on this claim is found in three paragraphs on page ten of her brief. Dkt. No. 43 at 10. She says that Kuiper denied her request without offering alternative accommodations and made no attempt to find out what was toxic about the environment or what could improve the environment. Id.

The letters in the record from Kuiper to the plaintiff reveal that Kuiper always responded to the plaintiff, investigated her requests and granted some of those requests or provided alternatives. He concluded that working from home would not allow her to perform the essential functions of her job, and the plaintiff has not refuted that beyond suggesting that he should have allowed her to try it for a month. Dkt. No. 52 at ¶74. She proffered no evidence that other people, performing similar job duties, worked from home twenty hours a week or worked flexible schedules. She proffered no evidence that Bradbury or Weslow allowed any employee in the department to work from home. The law does not require that an employer provide the exact accommodation the plaintiff prefers. Mobley v. Allstate Ins. Co., 531 F.3d 539, 546 (7th Cir. 2008); Jay v. Intermet Wagner, Inc., 233 F.3d 1014, 1017 (7th Cir. 2000).

The record shows that the defendants offered the plaintiff the ability to leave for appointments, reduce her hours or step away if necessary. The plaintiff says that Kuiper never tried to find out what was toxic about her environment, but she simultaneously admits that she never provided Kuiper with concrete details. Kuiper's November 21, 2013 letter told the plaintiff that she should file an EDS complaint if she felt that she was being discriminated against or harassed because of protected characteristics. Dkt. No. 52 at ¶75. The plaintiff filed the single complaint in 2012. There is no material issue of fact on the failure-to-accommodate claim. The court grants summary judgment on that claim, and the plaintiff has raised no other viable claim under federal law.

## IV. Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 33.

The court **ORDERS** that the case is dismissed and will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 8th day of April, 2020.

BY THE COURT:

_____

**HON. PAMELA PEPPER**
**United States District Judge**